# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LAVONTAE KNIGHT,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0102**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 59

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*, and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, Mahoning County Prosecutor's Office, for Plaintiff-Appellee and

*Atty. John B. Juhasz*, for Defendant-Appellant.

Dated: June 6, 2024

**HANNI, J.**

{¶1} Defendant-Appellant, Lavontae Knight, appeals from a Mahoning County Court of Common Pleas judgment convicting him of two counts of aggravated murder, two counts of attempted aggravated murder, two counts of aggravated robbery, two counts of kidnapping, and one count of felonious assault, all with firearm specifications. He was sentenced to a total of 58 years to life in prison.

{¶2} For the following reasons, we find that the cumulative nature of errors in this unique case infringed on Appellant's fundamental right to a fair trial. Accordingly, we reverse the trial court's judgment and remand this case for a new trial.

{¶3} On February 8, 2019, Appellant was indicted for: aggravated murder of Trevice Harris in violation of R.C. 2903.01(A), an unclassified felony; aggravated murder of Trevice Harris in violation of R.C. 2903.01(B), an unclassified felony; attempted aggravated murder of Quanisha Bosworth in violation of R.C. 2923.02/2903.03, a first-degree felony; attempted aggravated murder of Quanisha Bosworth in violation of R.C. 2923.02/2903.03, a first-degree felony; aggravated robbery of Trevice Harris in violation of R.C. 2911.01(A)(1), a first-degree felony; aggravated robbery of Quanisha Bosworth in violation of R.C. 2911.01(A)(1), a first-degree felony; kidnapping of Trevice Harris in violation of R.C. 2905.01 (A)(2)(3) and (F)(1), a first-degree felony; kidnapping of Quanisha Bosworth in violation of R.C. 2905.01(A)(2)(3), a first-degree felony; felonious assault of Quanisha Bosworth in violation of R.C. 2903.11(A)(2), a first-degree felony; having weapons while under disability in violation of R.C. 2923.13(A)(2)(3), a third-degree felony; and having weapons while under disability in violation of R.C. 2923.13(A)(2) and (B), a third-degree felony. Firearm specifications under R.C. 2941.145(A) accompanied the first nine charges.

{¶4} On February 24, 2022, Appellant filed a motion to dismiss his case pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant alleged that even though the prosecution knew the identity of a male's DNA found at the scene in 2019, they failed to disclose this identity until weeks before trial in 2022. Appellant noted that the trial court had disqualified the assistant prosecutor initially involved in the instant case after she made false statements and delayed discovery in another one of his cases.

{¶5} After a hearing on the motion, the trial court overruled the motion to dismiss, but granted a continuance of the jury trial to June 6, 2022. (Mar. 2, 2022 J.E.).

{¶6} A jury trial occurred on the first eight charges and the remaining charges were tried to the bench. Appellant was convicted on all counts.

{¶7} At trial, Quanisha Bosworth testified that she was dating Trevice Harris and in December 2018, she came to stay with him in Boardman, Ohio as she lived out of town. (Tr. at 398-399). She stated that Trevice knew Edward, who they called Meech, and Trevice knew Meech's brother, Slim. (Tr. at 400-401). Ms. Bosworth stated that Meech and two others were killed in November 2018 and she and Trevice attended Meech's funeral. (Tr. at 403). Trevice spoke to Slim at the funeral. (Tr. at 404).

{¶8} Ms. Bosworth explained that Trevice and Slim kept in contact after the funeral and Trevice wanted to donate money to Meech's children. (Tr. at 408). She related that Trevice and Slim were to meet on December 30, 2018 so Trevice could give Slim his donation. (Tr. at 408-409). Ms. Boswoth testified that Trevice took her Jaguar to meet Slim and she drove her Mercedes Benz to meet Trevice after stopping to get them food. (Tr. at 410).

{¶9} She related that she spoke to Trevice by phone so he could give her directions to the location where he met Slim. (Tr. at 412). She stated that he had her call on speaker while they were talking on the phone, which was unusual. (Tr. at 412). She arrived at the location and testified that Slim and an unknown female flagged her down as she pulled into the driveway behind her Jaguar. (Tr. at 412-413). She stated that Slim and the female then went into the house. (Tr. at 414). She testified that she knocked on the door and Slim opened it, said hello, and told her that Trevice was in the kitchen. (Tr. at 414).

{¶10} Ms. Bosworth testified that she walked into the kitchen and she and Trevice were held at gunpoint. (Tr. at 414). She related that a female patted her down and took her phone and coat. (Tr. at 415). She stated that she and Trevice stood in the kitchen with their hands up, and Slim and an unknown male held guns on them. (Tr. at 416). She stated that they took Trevice's wallet and keys, and Slim said to Trevice, "this is all you have?" and told them that they were going for a ride. (Tr. at 417-418). Ms. Bosworth related that she was afraid that she was going to get shot. (Tr. at 418). Their belongings

were returned, and Slim and the unknown male wiped their cell phone screens with socks that they had on their hands. (Tr. at 419).

{¶11} Ms. Bosworth testified that they walked to her Mercedes and Slim told her to sit in the front passenger seat, while Slim sat behind her. (Tr. at 419). She stated that Trevice sat in the back seat behind the driver, who was the unknown male. (Tr. at 420). She testified that they drove around a neighborhood, pulled off the road, and Slim told them that there was no need to run as no one was going to die. (Tr. at 420). She related that Slim held a gun in his hand. (Tr. at 421).

{¶12} Ms. Bosworth stated that the windows started to get foggy and the unknown male wiped them down. (Tr. at 421). She testified that the driver got out of the car while she, Trevice, and Slim remained inside. (Tr. at 422). She stated that she then heard a gunshot, looked around, and saw that Slim was outside of the car, but leaning in and shooting into the car. (Tr. at 422). She heard two shots and ducked. (Tr. at 423). She testified that she was shot on her left side and rolled over and played dead, but then jumped into the driver's seat and drove away. (Tr. at 423-424). She called 911 and asked Trevice if he was okay. (Tr. at 428). He smiled and said "yeah." (Tr. at 428). She notified the 911 dispatcher that "Slim" shot them as she did not know his legal name. (Tr. at 425). She pulled into a gas station to seek help. (Tr. at 424).

{¶13} Ms. Bosworth testified that the police came to the gas station and she told them that Slim shot her and Trevice. (Tr. at 429). She and Trevice were taken to the hospital. (Tr. at 431). She met with detectives at the hospital and the following day. (Tr. at 433). She was shown a photo array and selected Slim from the photos. (Tr. at 433). She recalled that as they were driving with Slim, he told Trevice that he was sparing their lives because they knew his brother. (Tr. at 436).

{¶14} On cross-examination, Ms. Bosworth testified that she could not identify the unknown driver or the female in the house. (Tr. at 439-440). She stated that Trevice did not have a job, but he had an apartment and gave cash to Meech. (Tr. at 443). She did not know whether Trevice and Meech were selling drugs together before they died. (Tr. at 444). Ms. Bosworth indicated that upon entering the kitchen of the house on Ferndale, the unknown female who patted her down was cooking something, but it was not drugs. (Tr. at 451). She also stated that although she sat in the front passenger seat of her

Mercedes, she could see with her peripheral vision that Slim had a black gun in his hand and was pointing it at her. (Tr. at 458).

{¶15} Ms. Bosworth testified that she could not identify the male or female from photo arrays, but she identified Slim as the shooter to the police on the night of the shooting, in the 911 call, and in a picture presented by the police to her. (Tr. at 464). She stated that she was one-hundred percent sure that it was Appellant. (Tr. at 465).

{¶16} Detective Sergeant Nicholas Bailey of the Youngstown Police Department (YPD) testified. (Tr. at 476). He indicated that when he arrived at the gas station parking lot, he saw Ms. Bosworth's Mercedes, noted that it was still running, and observed that the rear driver's side window was shot out. (Tr. at 480). He stated that Ms. Bosworth was emotional and told him she had been shot. (Tr. at 480). He testified that Trevice had a gunshot wound to the head and blood was pooling in the backseat of the car. (Tr. at 481). He saw that Trevice was unresponsive and sprawled across the backseat as if he had been seated in the back but fell over to the right. (Tr. at 481). He stated that Ms. Bosworth and Trevice were taken to the hospital. (Tr. at 482).

{¶17} Detective Bailey testified that he drove to the Ferndale address because he was informed that this may have been the scene of the shooting, and Appellant, who was a suspect, was associated with this address. (Tr. at 485). He observed nothing on the outside of the residence and lacked authority to enter the residence. (Tr. at 486).

{¶18} YPD Officer Greg Miller testified that he was called to the gas station and he took pictures of the Mercedes, the contents of the vehicle, and the surrounding area. (Tr. at 510-511). He noted a spent projectile, blood, and glass on the ground around the Mercedes, although most of the glass was lying on the door itself on the armrest and inside the back seat of the vehicle. (Tr. at 513).

{¶19} Emily Colucci-Simmons was the emergency medical technician called to the gas station. (Tr. at 599-600). She testified that she and her colleague removed Trevice from the car and he was conscious at the time and spoke to them. (Tr. at 602). She observed a gunshot wound to his head and he went into cardiac arrest, so she gave him CPR and lifesaving medications to restart his heart. (Tr. at 603). Trevice was pronounced dead upon arrival to the hospital. (Tr. at 605).

**{¶20}** Dr. Yazan Jadallah testified that he was the emergency room physician on call on December 30, 2018 when Ms. Bosworth was transported there. (Tr. at 613-614). He reviewed her medical chart and noted that she had five gunshot wounds to her arm and one to her upper back. (Tr. at 617). He noted that she had bullet fragments still lodged in her forearm and elbow area. (Tr. at 618).

**{¶21}** Forensic Pathologist Dr. Taner Bartholow testified that he conducted Trevice's autopsy on January 2, 2019. (Tr. at 653). He indicated the cause of death was a gunshot wound to the head and the manner of death was homicide. (Tr. at 666-667).

**{¶22}** Detective Sergeant Michael Lambert of the YPD testified that he was familiar with Appellant and his alias, Slim. (Tr. at 678). He stated that during an unrelated investigation, he took control of a person's phone and located a phone number associated with Appellant. (Tr. at 678). He indicated that Appellant's phone number was saved in the phone and identified "Slimmm" as the contact. (Tr. at 678).

**{¶23}** Michael Roberts testified that he is a forensic scientist for the Ohio Bureau of Criminal Investigation (BCI) assigned to the firearms division. (Tr. at 699). He testified that he tested a fired bullet removed from Trevice's left temple and a fired bullet found under the driver door of the Mercedes at the gas station. (Tr. at 708-709). He opined that the bullets were fired from the same firearm. (Tr. at 709).

**{¶24}** Forensic Scientist Sara Horst from the Biology DNA Unit of BCI testified that swabs from Ms. Bosworth's Jaguar and Mercedes were sent to her for analysis. She testified that no other DNA was found besides that anticipated from Ms. Bosworth and Trevice as repeated drivers. (Tr. at 749).

**{¶25}** Mahoning County Sheriff's Deputy Kip Danks testified that he was assigned to the U.S. Marshal task force and they received an arrest warrant for Appellant and located him on January 14, 2019 at his last known address on Leo Avenue in Youngstown. (Tr. at 754, 756). They knocked on the door of the duplex and a female opened the door. (Tr. at 759). He requested that the female and her children exit the house and he showed her a photo of Appellant and asked if he was in the house. (Tr. at 760). She did not confirm or deny his presence, but stated that a male was inside. (Tr. at 760). Deputy Danks indicated that one of the officers commanded Appellant to come to the door with his hands up as they had a warrant for his arrest. (Tr. at 760). He stated

that they received no response, and when they stepped into the house to clear the first floor, they found no one. (Tr. at 761).

{¶26} Deputy Danks testified that Officer Riddle of the task force commanded Appellant to come to the top of the steps to the second floor with his hands up. (Tr. at 762). Deputy Danks stated that Appellant presented himself at the top of the steps and when ordered to come down the steps, Appellant failed to comply for about ten minutes and kept looking back toward the right where rooms were located. (Tr. at 762-763). He then came down the steps, was handcuffed, and taken out of the house. (Tr. at 763). Deputy Danks stated that they then cleared the second floor and found no one else upstairs. (Tr. at 765).

{¶27} YPD Detective Sergeant Chad Zubal testified that he was at home when he received a call about the shooting. (Tr. at 791). He arrived at the gas station and the victims had already been taken to the hospital. (Tr. at 791). He had the Mercedes towed to a secure area after noticing blood and the broken window. (Tr. at 797). Detective Sergeant Zubal testified that he received information that the shooting happened in the Mercedes, but the Jaguar was at the location where Ms. Bosworth thought they were initially held at gunpoint. (Tr. at 796-797). He drove to that location and related that he believed that the Jaguar was dumped there as it was still running and located on the side of Ferndale. (Tr. at 798). He had the crime lab swab the Jaguar. (Tr. at 798).

{¶28} Detective Zubal drove to the hospital and spoke to Ms. Bosworth. (Tr. at 800). He testified that after speaking with her, he had Appellant in mind as a suspect. (Tr. at 800). He investigated Erie and Earl Streets, as Ms. Bosworth described the bend in the road and the appearance of a dead-end, out-of-the-way area with an old style stone wall and concrete barrier with cliffs behind it. (Tr. at 803). Detective Zubal testified that Ms. Bosworth also identified Appellant from a photo array at the police station. (Tr. at 809). He stated that he knew Appellant's alias was Slim and knew that he had a history at 324 Ferndale. (Tr. at 810). He also knew that Appellant's girlfriend was Kendrasia May, who lived at 344 Ferndale. (Tr. at 811). Another officer drove Ms. Bosworth to Ferndale in an unmarked car and she identified 324 Ferndale as the location where they were held at gunpoint. (Tr. at 814).

**{¶29}** Detective Zubal testified that he obtained Trevice's cell phone number from Ms. Bosworth's cell phone so that he could secure a search warrant for Trevice's cell phone as he had information that Appellant communicated with Trevice right before the shooting. (Tr. at 814). Upon securing the warrant, he testified that Trevice's phone showed that he communicated with one particular phone number. (Tr. at 816).

**{¶30}** Detective Zubal testified that he obtained a search warrant for 324 Ferndale, but the search yielded nothing of interest and appeared empty. (Tr. at 817). He noted that the location belonged to Appellant's grandmother. (Tr. at 817). Knowing that Appellant associated with Ms. May at 344 Ferndale, Detective Zubal testified that he knocked on the door of her house, but no one answered. (Tr. at 818).

**{¶31}** Detective Zubal testified that Trevice's cell phone records showed that he received a phone call from Ms. Bosworth right before the incident and the last call on Trevice's phone was to Ms. Bosworth at 10:41 p.m. (Tr. at 828). He explained that other calls on the phone included calls between Appellant and Trevice around the same time. (Tr. at 829). Detective Zubal stated that these phone calls corroborated Ms. Bosworth's story. (Tr. at 830). He also related that cell phone data on the same phone that called Trevice, presumably Appellant's, showed a phone call placed to Ms. May after midnight on December 31. (Tr. at 834). Detective Zubal testified that Ms. May had called 911 shortly after midnight and reported a break-in at her house. (Tr. at 834). She then called back and said it was just her sister. (Tr. at 834).

**{¶32}** Detective Zubal further testified that after he learned of Appellant's arrest at the Leo Avenue address, he obtained a search warrant for that location to look for the cell phone that communicated with Trevice's phone right before the shooting. (Tr. at 839). He found a phone during the search and stated that when he called the number on Trevice's phone, that phone rang. (Tr. at 840). He then spoke to Appellant, who initially informed him that he did not know Trevice, although he ultimately admitted that he did. (Tr. at 841). Detective Zubal stated that he showed Appellant a picture of Trevice and Appellant stated that he knew him only as "Soup." (Tr. at 841). Appellant also told Detective Zubal that he did not know that Trevice had been murdered, even though two weeks had elapsed between Appellant's arrest and the shooting. (Tr. at 842.)

**{¶33}** Detective Zubal testified that Appellant told him that Soup gave his family money after his brother was murdered.  (Tr. at 842).  He also told Detective Zubal that Soup gave him a baseball hat for his birthday, which was on December 29.  (Tr. at 842).  Detective Zubal stated that he wrote the cell phone number of the phone he found at the Leo address on a manila file folder and held it up to Appellant.  (Tr. at 845).  He testified that Appellant told him that he did not know that number and Appellant could not tell him his own cell phone number.  (Tr. at 845).  Detective Zubal related that eventually, Appellant told him that he communicated with Trevice using the phone number that Detective Zubal showed him.  (Tr. at 846).  Detective Zubal also testified that Appellant told him that he was no longer close with Ms. May and Appellant gave him his Facebook user name.  (Tr. at 851-852).  Detective Zubal stated that he looked up Appellant's Facebook profile and although Appellant denied the nickname "Slim," a post from his Facebook page stated, "Let me get them snaps @kingslim95."  (Tr. at 855).  He also noted that Meech's obituary did not identify Appellant by his legal name as Meech's brother, but identified "Slim."  (Tr. at 856-857).

**{¶34}** Detective Zubal further testified that he obtained DNA swabs from the Mercedes and the lab showed a CODIS hit from the interior back driver door handle of the vehicle.  (Tr. at 868).  He explained that CODIS was a program that informs whether submitted DNA matches someone in its database.  (Tr. at 869).  He stated that CODIS showed a hit for the DNA of Allen May, an associate of Appellant and the brother of his former girlfriend, Ms. May.  (Tr. at 869).  Zubal placed Mr. May in a photo line-up for Ms. Bosworth, but she did not identify him.  (Tr. at 870).  Zubal went to Mr. May's house and placed a business card inside the door after no one answered.  (Tr. at 871).  He stated that he did not believe that Mr. May was a big priority in the case since Ms. Bosworth did not identify him in the photo array.  (Tr. at 871).  He scheduled dates with Mr. May to come to the police station to talk, but Mr. May did not appear.  (Tr. at 872).

**{¶35}** Detective Zubal also reported that he listened to recorded jail phone calls between Appellant and Mr. May after he interviewed Appellant and had spoken to Mr. May to schedule a conversation.  (Tr. at 874).  He related that they spoke on the phone about him leaving his card at Mr. May's house.  (Tr. at 878).

**{¶36}** On cross-examination, Detective Zubal indicated that he did not obtain copies of the video or film from the cameras that were located at the gas station. (Tr. at 883). He also confirmed that he did not ask Ms. Bosworth to identify any clothing worn by the perpetrators. (Tr. at 900). He testified that there was no black refrigerator located in the kitchen at 324 Ferndale, even though Ms. Bosworth testified that she saw a black refrigerator there when she and Trevice were held at gunpoint. (Tr. at 888). Detective Zubal also stated that he failed to write in his notes whether he questioned or asked the name of the woman who came outside at 324 Ferndale when he was executing the search warrant there. (Tr. at 889-890). He further acknowledged that he did not get DNA swabs on a jacket or hat found in the Mercedes, even though Trevice was wearing a jacket and hat and the jacket had a hole in it. (Tr. at 895-896).

**{¶37}** Detective Zubal acknowledged that Appellant's DNA was not found in the Mercedes and CODIS showed Allen May's DNA in the back seat. (Tr. at 902-903). He admitted that even though the CODIS hit was in June 2019, he did not speak to Mr. May until April of 2022. (Tr. at 904). He further stated that Ms. Bosworth positively identified Gino NeverLacking in a photo array as the driver of the Mercedes that night, but his DNA was never taken. (Tr. at 908-909). Detective Zubal also confirmed that Appellant had other cell phones and Trevice was helping Appellant financially. (Tr. at 912-914). Detective Zubal testified that he did not look into who owned the house at 324 Ferndale and he looked around for nearby houses with Ring cameras, but he did not notice any. (Tr. at 922).

**{¶38}** On redirect examination, Detective Zubal testified that he told Ms. Bosworth that no black refrigerator was present at 324 Ferndale and she became upset and stated that she may have been at two separate locations. (Tr. at 938). Detective Zubal also indicated that he did not search 344 Ferndale because he lacked cause to obtain a warrant. (Tr. at 939). He explained that he did not get an arrest warrant for Mr. May because Ms. Bosworth did not identify him and May was not cooperative with police. (Tr. at 940-941). He also acknowledged that the instant case concerned Appellant as the shooter and not others involved in the kidnapping and driving. (Tr. at 945).

**{¶39}** The defense presented psychologist Margaret Bull Kovera as an expert witness. (Tr. at 967). She studied legal decision-making and eyewitness identification

accuracy for the last 30 years. (Tr. at 970). She explained that memory was not always an accurate record of what a person sees, as factors like stress and race affect a person's ability to store accurate information that he or she perceives. (Tr. at 975). She stated that her studies showed that something dangerous, like a gun, directs one's attention away from faces because a person would be more worried about the gun and protecting himself or herself. (Tr. at 977). She further explained that memory is also distorted when multiple perpetrators are involved in a crime because the victim has to divide attention among many people, so that he or she would have weaker and less reliable memory and identification. (Tr. at 977-978).

{¶40} Dr. Bull Kovera also testified that eyewitnesses who have seen someone in the past are more likely to transfer events onto the face of that person and faces can get mixed up as a result. (Tr. at 979-980). She also opined that once someone has been arrested, a person becomes more confident in his or her identification. (Tr. at 981). She concluded that these factors, and especially multiple factors together, can result in misidentification by an eyewitness. (Tr. at 981).

{¶41} On August 12, 2022, the jury convicted Appellant on the first nine counts with the firearm specifications.

{¶42} On August 17, 2022, the court held a conference with the State, Appellant, and his counsel. (Aug. 17, 2022 Tr. at 1). The court informed the parties that the court met with the jury on August 12 to thank them after they returned their verdicts. (Aug. 17, 2022 Tr. at 2). The court related that one of the jurors raised a question about their safety and the court answered the question. (Aug. 17, 22 Tr. at 2). The court related that later in the evening on August 12, the court bailiff called and reported that she overheard a juror state that one of the jurors had been followed the night before the verdicts. (Aug. 17, 2022 Tr. at 3). The bailiff informed the court that she asked the juror to step into the hallway and that juror identified P.H. as the juror who stated that she had been followed. (Aug. 17, 2022).

{¶43} The court explained at the conference that it had ordered the jurors to return to the courthouse to speak to each of them and ask about the incident. (Aug. 17, 2022 Tr. at 16-19). Appellant's counsel objected to proceeding, stating that he wished to research this issue. (Aug. 17, 2022 Tr. at 18). Appellant's counsel also objected to the

court asking the jurors whether the incident impacted their verdict as he believed that they would most likely deny that it did. (Aug. 17, 2022 Tr. at 14).

**{¶44}** The court nevertheless proceeded to question each juror separately and began by calling P.H. into chambers and placing her under oath. (Aug. 17, 2022 Tr. at 19). The court allowed both the prosecution and defense counsel to submit questions to the court to ask each juror. (Aug. 17, 2022 Tr. at 29). Appellant waived his right to be present during the questioning.

**{¶45}** On August 26, 2022, Appellant, with permission and through counsel, filed a motion for a new trial. He asserted that a juror's misconduct violated his constitutional right to due process when P.H. informed the jury during deliberations that she was followed home by persons associated with Appellant. He also contended that the State committed violations of *Brady* by failing to disclose the exculpatory evidence of the CODIS hit on Allen May's DNA in the back of the Mercedes that had been known to the prosecution since 2019.

**{¶46}** On September 15, 2022, the trial court found Appellant guilty of the last two counts of the indictment.

**{¶47}** On September 29, 2022, the court issued a judgment entry indicating that it found Appellant guilty of the last two counts of the indictment and it had overruled Appellant's motion for a new trial. The court indicated that it held a sentencing hearing and sentenced Appellant to life imprisonment with parole after 30 years for the aggravated murder of Trevice Harris in Count 1 of the indictment. The court also imposed a consecutive 3-year prison sentence for the firearm specification in Count 1. The court further found that the Count 2 murder conviction merged with Count 1 and the State proceeded on Count 1.

**{¶48}** The court also imposed a sentence of 11 years in prison on Count 3, to run consecutively with Count 1, with 3 years in prison on the accompanying Count 3 firearm specification, to run prior to and consecutively with the 11 years. The court found that the Count 4 conviction and firearm specification merged with Count 3 and the State proceeded with Count 3.

**{¶49}** The court also imposed 11 years in prison on Count 5, with the accompanying 3-year firearm specification to run concurrently with the sentence imposed

in Count 3. The court imposed 11 years in prison on Count 6, with 3 years in prison for the accompanying firearm specification, to be served consecutively to the sentence in Count 3. The court imposed 11 years on Count 7, with 3 additional years for the firearm specification, to merge with Count 5 for sentencing, since the prosecution elected to proceed on Count 5. The court further imposed 11 years in prison on Count 8, with 3 years in prison on the firearm specification, to merge with Count 6 at the election of the prosecution. The court imposed 11 years in prison on Count 9 with 3 years on the firearm specification, to merge with Count 3, since the State elected to proceed on Count 3. The court imposed 3 years on the Count 10 and Count 11 convictions, to run concurrently to the prior sentences.

**{¶50}** The court's total sentence imposed was life in prison with parole eligibility after serving 58 full years. Appellant was given credit for 1,339 days in prison.

**{¶51}** On September 22, 2022, Appellant filed a notice of appeal in which he asserts seven assignments of error. We take these assignments of error out of chronological order as necessary.

**{¶52}** In his first assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED BY FAILING TO DECLARE A MISTRIAL DUE TO JURY MISCONDUCT, THUS DENYING APPELLANT A FAIR TRIAL BY AN IMPARTIAL JURY, GUARANTEED BY U.S. CONST. AMEND. VI AND XIV AND OHIO CONST. ART I, §§1, 2, 5, 10, AND 16.**

**{¶53}** Appellant asserts that P.H. committed juror misconduct by telling the other jurors that two people followed her home as she left the courthouse the day before deliberations. Appellant contends that the ultimate question was not whether an outside influence impacted the verdict, but why the jury did not abide by court admonitions. He quotes the court's admonition instructing the jury that:

You must consider and decide this case solely upon the evidence received in the courtroom.

If you should accidentally acquire information from an outside source, you must not report it to the other jurors. You must disregard it in your

deliberations; and in addition, again, you should report the outside source of the information immediately to Stephanie [the bailiff] and she will let me know.

(Trial Tr. at 365).  Appellant cites juror bias cases, including *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), *Adams v. Eppinger,* N.D. Ohio No. 4:21CV00158, 2023 U.S. Dist. LEXIS 24264 (Feb. 13, 2023), and *State v. Williams*, 79 Ohio St. 1, 4, 1997-Ohio-407, 679 N.E.2d 646, in support of his assertion that the court's hasty hearing to save the jury verdict constituted implied juror bias and misconduct.  He reasons that the jurors' failures to report P.H.'s comment to the court violated the court's admonition and constituted an outside influence on the jurors.

{¶54}  Appellant's jury trial began on Monday, August 8, 2022, and the jury returned guilty verdicts on Friday, August 12, 2022.  The court met with the jurors thereafter to thank them and juror J.B. asked the court about juror safety.  (Aug. 17, 2022 Tr. at 2).

{¶55}  The court then scheduled a conference on Wednesday, August 17, 2022, with counsel and Appellant present and informed them of the bailiff's phone call overhearing the juror comment.  The court informed the parties that the court obtained more details on Monday, August 15, 2022, and met with YPD Sergeant Evans and observed a video showing two spectators in the courtroom who followed 30-40 feet behind P.H. as a deputy sheriff escorted her across the street to her car.  (Aug. 17, 2022 Tr. at 4).  The court related that P.H. stated that she was aware of them, they got into a maroon Equinox, and they started following her home, so she took an alternate route and the car pulled away and stopped following her.  (Aug. 17, 2022 Tr. at 4).

{¶56}  The court informed the parties that it scheduled the instant conference and called the jury back and separated them.  (Aug. 17, 2022 Tr. at 5).  The court related its intention to individually voir dire the jurors to ask about what happened, who was informed of the incident, and whether their deliberations or verdicts were impacted by P.H.'s communication of the incident.  (Aug. 17, 2022 Tr. at 5).

{¶57}  Counsel for Appellant requested time to research the issue and the type of questions to ask the jurors because this type of incident never arose before in his experience.  (Aug. 17, 2022 Tr. at 6-7).  He explained that in order to properly represent

Appellant, he wanted to properly educate himself before submitting questions to the court for questioning the jurors.  (Aug. 17, 2022 Tr. at 7).

**{¶58}**  The court stated that while it appreciated counsel's position, it wished to timely address the issue before memories faded and the risk increased of something extraneous happening.  (Aug. 17, 2022 Tr. at 7).  The court stated that it would proceed to voir dire each juror, allow the parties to submit questions to the court to ask the jurors, allow counsel to brief the issue afterward, and then recall the jurors if other questions or issues arose.  (Aug. 17, 2022 Tr. at 10).

**{¶59}**  The court explained that the juror responses to voir dire could establish that no further action was necessary or it could result in a motion to set aside the verdicts.  (Aug. 17, 2022 Tr. at 10).  Defense counsel objected to the court asking each juror whether P.H.'s story impacted their deliberations or verdicts as counsel believed that no juror was going to admit that it did.  (Aug. 17, 2022 Tr. at 11).  The court overruled counsel's objection, holding that the impact of the incident on the deliberations and verdicts was the ultimate question to be asked and answered.  (Aug. 17, 2022 Tr. at 12).  The court allowed counsel to submit questions to the court to ask the jurors during the voir dire if they wished to do so.  (Aug. 17, 2022 Tr. at 13).

**{¶60}**  The court conducted the voir dire and placed each juror under oath.  (Aug. 17, 2022 Tr. at 18-96).  Appellant filed a motion for new trial based in part on the alleged juror misconduct of P.H.  The court denied the motion.

**{¶61}**  The Sixth Amendment to the United States Constitution mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]"  The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a defendant accused of a state criminal violation be tried before a panel of fair and impartial jurors.  *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).  The Ohio Constitution guarantees the right to "a speedy public trial by an impartial jury."  Ohio Constitution, Article I, Section 10.  "A jury's verdict must be based solely on the evidence and argument presented in open court, not on any outside influence."  *State v. Robinson*, 7th Dist. Jefferson No. 05 JE 8, 2007-Ohio-3501, ¶ 94, citing *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.E. 879 (1907), and quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.E.2d 78 (1981).

**{¶62}** Crim.R. 33(A)(2) states that a new trial may be granted based on jury misconduct if it materially affected the defendant's substantial rights. We review a trial court's ruling on a motion for new trial under Crim. R. 33(B) for abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990). Trial courts are also granted broad discretion in determining whether to declare a mistrial or remove a juror in cases concerning outside influences on jurors. *State v. Phillips*, 74 Ohio St.3d 72, 89, 1995-Ohio-171, 656 N.E.2d 643. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶63}** In *Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the U.S. Supreme Court held that:

> [t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id.* at 229-230.

**{¶64}** In *Phillips*, *supra*, at 88, the Ohio Supreme Court held that "[w]hen a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." (citing *Smith v. Phillips*, 455 U.S. 209, 215-216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 84 (1982) and *Remmer, supra*, at 229-230.) The Court held that prejudice is presumed in a criminal case where there is any private communication "with a juror during a trial about the matter pending before the jury." *Id.* This prejudice is not conclusive, however. *Remmer, supra.*

**{¶65}** Appellant contends that *Remmer* required more than the actions taken by the trial court. He contends that the court should have found implied bias and allowed defense counsel to prepare and research the matter before proceeding with the voir dire of the jury. He cites *State v. Rudge,* 89 Ohio App.3d 429, 624 N.E.2d 1069, (11th Dist. 1993*)* and *Adams v. Eppinger*, N.D. Ohio No. 4:21CV158, 2023 WL 1969740 Feb. 13, 2023), in support.

{¶66} *Remmer*, *Rudge*, and *Adams* are distinguishable from this case. The jurors in those cases either received outside communications or heard or discovered outside information pertaining to the defendants. In *Remmer*, a juror who became jury foreman was approached by an unnamed person and told that he could profit if he returned a favorable verdict to Remmer. *Remmer*, *supra*, at 228. In *Rudge*, an alternate juror informed the court that a male juror commented before opening statements that "[w]e could save a lot of time and money and just hang him now" and another juror stated on the second day of trial at lunch that the defendant "better enjoy it [lunch] now, because he won't be around much longer." *Rudge, supra*, at 431. In *Adams*, jurors learned of Adams' prior violent convictions. *Adams, supra*, at *7.

{¶67} Here, Juror P.H. told other jurors that she thought two courtroom spectators followed her into the parking lot and as she drove home the night before deliberations. There were no communications with P.H. and no threats.

{¶68} However, we are troubled by the trial court's decision to deny defense counsel's request for additional time before conducting the juror voir dire. Defense counsel asked for time to conduct research to educate himself on juror bias cases and provide clarifying questions for the court to ask during voir dire. The trial court denied that request, informing the parties that the juror responses may lead the court to declare a mistrial or to take no further action at all. The court further informed counsel that they could brief the issue after the voir dire.

{¶69} The trial court proceeded to voir dire each juror, with counsel present. The court placed P.H. under oath and she related that as a deputy sheriff walked her to her car after the trial, she looked out of the corner of her eye and felt like they were being followed. (Aug. 17, 2022 Tr. at 18-19). She asked the deputy if it was usual procedure to walk the jurors out and the deputy affirmed, stating that juror safety was the number one priority and they wanted to make sure that no one spoke to jurors. (Aug. 17, 2022 Tr. at 19). P.H. indicated that the deputy then stated that P.H. may have noticed that they were being followed and this was why they walked jurors to their cars. (Aug. 17, 2022 Tr. at 19). P.H. stated that she thought she previously saw the two females in the courtroom. (Aug. 17, 2022 Tr. at 21).

Case No. 22 MA 0102

{¶70} P.H. related that as she started her car and left the parking lot to head toward home, she saw a burgundy SUV with the same two females following her. (Aug. 17, 2022 Tr. at 22). She stated that she started driving around town rather than going home. (Aug. 17, 2022 Tr. at 22). She indicated that she was a paranoid person and her family could confirm this because she previously told them that she thought people followed her in grocery stores. (Aug. 17, 2022 Tr. at 23). She stated that she was near Belle Vista Avenue heading toward Austintown before the SUV stopped following her. (Aug. 1, 2022 Tr. at 24).

{¶71} P.H. stated that the two females never approached her or said anything to her. (Aug. 17, 2022 Tr. at 25). She related that when she returned to court on Friday for deliberations, jurors were discussing how they felt safe with deputies walking them to their cars and someone asked if anyone had experienced problems. (Aug. 17, 2022 Tr. at 25). P.H. responded that she thought that she was followed and another juror asked if she reported it. (Aug. 17, 2022 Tr. at 26). She stated that she did not and discovered later that a juror told the bailiff about her incident. (Aug. 17, 2022 Tr. at 27).

{¶72} P.H. stated that her remarks to the other jurors occurred before jury instructions and deliberations and the incident did not come up at all during deliberations. (Aug. 17, 2022 Tr. at 29). She thought three other jurors heard her remarks. (Aug. 17, 2022 Tr. at 31). She told the court again that she was a very paranoid person. (Aug. 17, 2022 Tr. at 31). When asked if the incident impacted her deliberations, she stated, "[a]bsolutely not. Had nothing to do with anything." (Aug. 17, 2022 Tr. at 31). She affirmed that the verdicts were based solely on the evidence presented at trial. (Aug. 17, 2022 Tr. at 31).

{¶73} The court performed a voir dire of every other juror under oath with counsel present. Juror J.B. stated that P.H. told the entire jury about the incident, but she seemed hesitant to do so. (Aug. 17, 2022 Tr. at 35). He thought that this occurred during deliberations, but jurors were having other conversations at the time, so he was unsure that everyone paid attention when P.H. was talking. (Aug. 17, 2022 Tr. at 37). He indicated that once P.H. said she was followed, no one followed up on the conversation. (Aug. 17, 2022 Tr. at 38). He stated that he was the one who told the bailiff about P.H.'s incident. (Aug. 17, 2022 Tr. at 39). He stated that it did not impact his deliberations or

verdicts as they were based solely on the evidence presented at trial. (Aug. 17, 2022 Tr. at 39).

**{¶74}** Juror P.S. stated that P.H. mentioned the incident, but not during deliberations. (Aug. 17, 2022 Tr. at 43). He said that all jurors heard P.H. and no one responded except J.B., because P.H. stated that she was not sure she was followed. (Aug. 17, 2022 Tr. at 44). He related that the incident did not impact his deliberations. (Aug. 17, 2022 Tr. at 45). He stated that he did not give it a second thought because P.H. said it was a coincidence that it happened. (Aug. 17, 2022 at 46).

**{¶75}** Juror D.S. stated that he heard one of the jurors suspect that she had been followed as she left the parking lot. (Aug. 17, 2022 Tr. at 49). He did not recall when the comment occurred or who heard the comment. (Aug. 17, 2022 Tr. at 49). He stated that it did not impact his deliberations or verdicts. (Aug. 17, 2022 Tr. at 49-50).

**{¶76}** Juror K.P. recalled P.H.'s comment about being followed. (Aug. 17, 2022 Tr. at 51-52). She stated that all jurors heard the comment, but she could not remember when it occurred. (Aug. 17, 2022 Tr. at 52-53). She stated that the comment did not impact her deliberations and her verdicts were based solely on evidence presented at trial. (Aug. 17, 2022 Tr. at 53-54).

**{¶77}** Juror M.M. stated that P.H. made a statement and there was not much discussion about it. (Aug. 17, 2022 Tr. at 55). She said that all jurors heard the statement and it was made before deliberations when they were deciding lunch. (Aug. 17, 2022 Tr. at 56). She recalled that some jurors told P.H. to notify someone. (Aug. 17, 2022 Tr. at 57). M.M. stated that it did not impact her deliberations and her verdicts were based on the evidence presented at trial. (Aug. 17, 2022 Tr. at 58).

**{¶78}** Juror K.W. did not recall who commented that they had been followed, but all jurors heard the statement. (Aug. 17, 2022 Tr. at 62). He stated that most jurors parked in the same lot as P.H. and he knew for sure that one of the two females P.H. thought followed her was present in the courtroom. (Aug. 17, 2022 Tr. at. 63). He stated that he also noticed her while they were walking to the lot and she was texting on her phone, walking in the same direction as them. (Aug. 17, 2022 Tr. at 63). He did not recall when P.H. made the statement. (Aug. 17, 2022 Tr. at 65). K.W. stated that the statement did not impact his deliberations or his verdicts. (Aug. 17, 2022 Tr. at 67).

{¶79} Juror M.A. stated that she overheard a juror stating that she thought she had been followed on her way home and she did not drive directly home because she was scared. (Aug. 17, 2022 Tr. at 70). M.A. recalled that the statement occurred during a break before deliberations and everyone heard it. (Aug. 17, 2022 Tr. at 70). She stated that this did not impact her deliberations and her verdicts were based solely on the evidence presented at trial. (Aug. 17, 2022 Tr. at 72-73).

{¶80} Juror S.B. recalled P.H.'s conversation about being followed, but said she was not really paying attention. (Aug. 17, 2022 Tr. at 75). She said that her deliberations and verdicts were based on the evidence presented at trial. (Aug. 17, 2022 Tr. at 76).

{¶81} Juror B.S. recalled P.H. stating that the females in the courtroom were in the car next to hers in the parking lot. (Aug. 17, 2022 Tr. at 78-79). She thought that P.H. made the statement before deliberations and she did not see anything unusual as she parked in the same lot as P.H. (Aug. 17, 2022 Tr. at 80). She recalled that the statement made by P.H. lasted a minute or two and it never came up again. (Aug. 17, 2022 Tr. at 81). B.S. said that the statement by P.H. did not impact her deliberations or verdicts. (Aug. 17, 2022 Tr. at 82).

{¶82} Juror D.N. recalled P.H.'s statement lasting about a minute and he stated that he also felt like he was followed at times during the trial. (Aug. 17, 2022 Tr. at 84). He was a truck driver and used his rearview mirrors frequently. (Aug. 17, 2022 Tr. at 87). He stated that he did not recognize any particular individual, but he thought that he was followed twice and saw that they eventually turned off from the direction that he was driving. (Aug. 17, 2022 Tr. at 89). He stated that P.H.'s statement did not impact his deliberations and his verdicts were based solely on the evidence presented at trial. (Aug. 17, 2022 Tr. at 90).

{¶83} Juror D.S. recalled P.H.'s statement, but did not recall when it was made. (Aug. 17, 2022 Tr. at 93). He stated that he heard some of the statement and thought it was made at the end of deliberations. (Aug. 17, 2022 Tr. at 94). He recalled seeing some people who sat in the gallery walking in the lot where he, P.H., and others parked. (Aug. 17, 2022 Tr. at 95). He said he did not worry about them. (Aug. 17, 2022 Tr. at 95). He stated that his deliberations and verdicts were not impacted by P.H.'s statement and were based on evidence presented at trial. (Aug. 22, 2022 Tr. at 96).

**{¶84}** We find from the record that no actual contact or communication with the two spectators occurred and P.H. did not learn any outside information. Further, we note that the trial court allowed counsel to participate in the voir dire by submitting questions for the court to ask each juror and sitting in on the voir dire. We are also aware that all jurors, including P.H., stated that their deliberations or verdicts were not influenced by P.H.'s statements that she believed that she was followed by the two females. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *State v. Phillips*, 74 Ohio St.3d 72, 89, 656 N.E.2d 643 (1995).

**{¶85}** However, while we appreciate the trial court's need to proceed with the voir dire expeditiously, the court should have permitted counsel some time before conducting the voir dire. The court denied defense counsel any additional time to absorb this unique situation, conduct legal research, and to determine pertinent questions to submit for the court to ask each juror. Further, even though the court allowed counsel to brief the issue after voir dire, the opportunity to submit pointed questions was lost.

**{¶86}** Consequently, we find that the trial court erred by denying counsel's request for additional time before immediately proceeding to voir dire the jury. While this error alone does not constitute cause for reversal, it does combine with other unique circumstances in this case to create a cumulative effect that deprived Appellant of a constitutional right to a fair trial.

**{¶87}** In his third assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED OVERRULING THE DEFENDANT'S MOTION TO DISMISS FOR *BRADY* VIOLATIONS**.

**{¶88}** Appellant contends that the trial court erred by denying his motion to dismiss his case after learning that Appellee committed a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant also asserts that the court should have taken more aggressive action than granting a trial continuance based on this discovery violation.

**{¶89}** Appellant submits that BCI conducted a DNA analysis of Ms. Bosworth's Mercedes and Jaguar and its April 19, 2019 lab report revealed that Appellant's DNA was not found in either car. The report did indicate that an unidentified male's DNA was found

on the rear interior handle of the Mercedes. In its supplemental discovery dated February 22, 2022, the State provided defense counsel with an April 30, 2019 report to Detective Zubal that the DNA of the unknown male was that of Allen May.

{¶90} Appellant asserts that for two years, the prosecution concealed that Allen May's DNA showed up on CODIS after it was found in the Mercedes. Appellant explains that Allen May is the brother of Kendrasia May, who lived very close to the address that Ms. Bosworth thought was the address of the kidnapping. Appellant relates that the assistant prosecutor who began the prosecution in the instant case, Attorney Dawn Cantalamessa, was the same assistant prosecutor disqualified and removed by the trial court for making false statements and delaying discovery in another one of Appellant's cases. He asserts that the court's continuance of the trial in this case was inadequate for the prosecution's *Brady* violation in delaying two years to identify the DNA.

{¶91} Appellee asserts that the trial court correctly found that no *Brady* violation occurred. Appellee contends that no *Brady* violation occurred because the prosecution informed Appellant in May 2019 that DNA from an unknown male was found in the Mercedes and informed Appellant that the DNA was that of Allen May on February 22, 2022, well before the March 7, 2022 trial was scheduled to begin. Appellee further asserts that *Brady* applies only when exculpatory evidence or information is discovered after trial that was known to the prosecution and not known to the defense. Appellee reasons that because Appellant was informed of the DNA information prior to trial, *Brady* does not apply.

{¶92} Appellee also argues that even if a *Brady* violation did occur, the trial court properly continued the case rather than dismiss it. Appellee notes that Crim.R. 16(L)(1) vests the court with discretion to determine the sanction for nondisclosure of favorable material. Appellee further cites *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, and *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 2, 511 N.E.2d 1138 (1987), for the holding that a trial court must impose the least restrictive sanction to cure a discovery violation.

{¶93} We note that the trial court disqualified Attorney Dawn Cantalamessa from prosecuting Appellant in an unrelated Mahoning County criminal case, Case Number 19-CR-109(A). (July 19, 2021 J.E. in Case No. 19-CR-109(A)). The court there held that

Attorney Cantalamessa made false statements to the court in violation of the Ohio Rules of Professional Conduct and withheld favorable evidence from the defense which Crim.R. 16 required her to disclose. (July 19, 2021 J.E. in Case No. 19-CR-109(A)). The court's judgment entry granted the defense's motion to disqualify Attorney Cantalamessa from that case. (July 19, 2021 J.E. in Case No. 19-CR-109(A)).

**{¶94}** At the March 1, 2022 hearing on the motion to dismiss the instant case under *Brady*, defense counsel discussed the disqualification of Attorney Cantalamessa in Appellant's other case. Defense counsel acknowledged that Attorney Cantalamessa provided him discovery supplements throughout the beginning of this case, but the DNA results identifying Allen May in 2019 were not provided to the defense until 2022. (Mar. 1, 2022 Tr. at 2-32).

**{¶95}** The prosecution informed the court that Attorney Cantalamessa had left the prosecutor's office and cited case law providing that a *Brady* violation does not occur until a defendant has gone to trial without the benefit of the favorable evidence. (Mar. 1, 2022 Tr. at 32-34). The assistant prosecutor further represented that she was present in the other case and as a result, she thoroughly reviewed the file in the instant case and all other cases because the prosecution took the court's order seriously from that case. (Mar. 1, 2022 Tr. at 37-38). The assistant prosecutor acknowledged that the instant case was indicted three years ago, but numerous continuances were requested by the defense, the COVID-19 shutdown occurred, and the Allen May DNA report was provided on February 22, 2022, well in advance of the previously scheduled trial date of March 7, 2022. (Mar. 1, 2022 Tr. at 38).

**{¶96}** Under *Brady*, the government must "turn over evidence that is both favorable to the defendant and material to guilt or punishment." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 154. "'Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.'" *Id.*, quoting *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994), citing *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), fn. 20. Evidence is material if a "'reasonable probability'" exists that the result of the trial would have been different had the evidence been disclosed to the defense. *Osie, supra*, at ¶ 153, quoting *Kyles v.*

*Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**{¶97}** Following *Brady*, the Supreme Court clarified that, "[t]he rule of *Brady v. Maryland*, 373 U.S. 83, arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *Agurs, supra*, at 103. In *State v. Hanlin*, 7th Dist. Jefferson No. 97-JE-33, 2000 WL 748120, *4, we held that, "[b]ecause the alleged withholding of exculpatory evidence was discovered before trial and was presented at trial, there was no *Brady* violation."

**{¶98}** Allen May's DNA was discussed at trial during the examination of Detective Sergeant Zubal. (Tr. at 869-872, 902-906). Defense counsel asked him about the fact that Appellant was found not to be a major contributor to DNA in the Mercedes while Allen May's DNA was found on the back seat handle. (Tr. at 902-903). Defense counsel also noted that even though Allen May's DNA was discovered from a CODIS hit in 2019, police did not interview him until 2022. (Tr. at 903-904). Nor did police obtain a copy of the video from the camera at the gas station or swab a hat and jacket found in the Mercedes for DNA allegedly worn by Trevice, even though a hole was found in the jacket. (Tr. at 883-884, 895). Since defense counsel was provided with the Allen May DNA evidence before trial, we find that the court properly held that *Brady* was not violated.

**{¶99}** However, we question the trial court's decision finding that no violation of Crim.R. 16 existed and granting Appellant a continuance. Crim.R. 16 governs discovery and includes the disclosure of evidence favorable to the defendant and material to his guilt or punishment. Crim.R. 16(B)(5). Crim.R. 16(L) provides that:

> [t]he trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶100} "Sanctions for a Crim.R. 16 discovery violation are within the discretion of the trial court." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 20. However, the court must consider certain factors and impose the least drastic sanction possible to cure the violation. *Id.* at ¶ 38-41; *Lakewood v. Papadelis*, 32 Ohio St.3d 1, *5, 511 N.E.2d 1138 (1987).

{¶101} Due to the unique circumstances surrounding this case, we find that the trial court's grant of a continuance was an inadequate remedy for the prosecution's failure to provide the defense with the CODIS information as to Allen May. Allen May's DNA was identified and known to the police and prosecution in 2019. Despite responding to numerous discovery requests from 2019-2022, the prosecution never disclosed this. The police did not investigate, question or speak to Allen May until 2022. Further, May's DNA was found in the backseat of the Mercedes and Appellant's DNA was not a major contributor therein. This is the seat where Ms. Bosworth stated Appellant was sitting before he exited the car and shot Trevice. However, Trevice had a bullet hole on the left side of his head and he was seated in the back seat behind the driver.

{¶102} Further, the same court handling this case disqualified and removed Attorney Cantalamessa from Appellant's other criminal case. The court disqualified Attorney Cantalamessa in the other case for making false statements to the court and withholding discovery favorable to Appellant. Attorney Cantalamessa was initially prosecuting the instant case while she was prosecuting Appellant in his other criminal case. Similar conduct as to withholding favorable evidence appears to have spilled over to the instant case. The court appeared to indicate as much when it stated that: "[a]nd, again, it is troubling that certain inculpatory evidence was provided and exculpatory evidence withheld." (Mar. 1, 2022 Motions Hg. Tr. at 63).

{¶103} The trial court discussed its removal of Attorney Cantalamessa from Appellant's other criminal case and stated its appreciation of the prosecution's steps in remedying the issues "relating to the prompt and fair administration of justice." (Mar. 1, 2022 Motions Hg. Tr. at 63). The court remarked that:

> [a]nd when I say prompt, quite frankly, there have been far too many cases
> where a trial has been set and there was a need to continue the trial based

upon supplemental discovery being turned over because, quote, we didn't know about it, close quote.

(Mar. 1, 2022 Motions Hg. Tr. at 63).

{¶104} While we find that the trial court properly held that no *Brady* violation occurred from failing to identify Allen May's DNA to the defense at an earlier time, we find that the court erred by granting Appellant only a continuance of the trial. The lengthy delay in disclosing the favorable evidence in this case, the questionable tactics used by the same assistant prosecutor in another of Appellant's cases, and the trial court's leniency to the State in Appellant's other case for similar conduct, lead us to conclude that more than a continuance in this case was warranted.

{¶105} While the trial court error here alone does not constitute cause for a reversal, this error, combined with the error in Assignment of Error Number 1, created a cumulative effect on Appellant's constitutional right to a fair trial. This will be addressed in Appellant's Assignment of Error Number 7.

{¶106} In his seventh assignment of error, Appellant asserts:

**APPELLANT WAS DENIED A FAIR TRIAL BECAUSE OF THE CUMULATIVE ERROR.**

{¶107} Appellant contends that numerous errors in this case violated his right to a fair trial. We agree.

{¶108} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). This means that if the court finds various errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together. *State v. Donkers*, 170 Ohio App.3d 509, 2007-Ohio-1557, 867 N.E.2d 903, ¶ 202 (11th Dist.).

{¶109} We find that cumulative error exists in this case. While the errors identified in Appellant's Assignment of Error Numbers 1 and 3 do not rise to the level of constitutional error individually, their unique circumstances combine to have impacted Appellant's fundamental right to a fair trial.

**{¶110}** Accordingly, we find merit to Appellant's seventh assignment of error and we reverse Appellant's convictions and remand this case for a new trial.

**{¶111}** In his second assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED BY GRANTING THE STATE'S MOTION *IN LIMINE* AS TO EYEWITNESS EXPERT TESTIMONY, DEPRIVING APPELLANT OF THE ABILITY TO PRESENT A DEFENSE**.

**{¶112}** Appellant contends that the trial court denied him the right to present a defense by improperly barring his expert from offering an opinion as to the specific reasons why she thought Ms. Bosworth's identification of Appellant as the shooter was mistaken. Appellant explains that many cases involve only eyewitness identification testimony, jurors tend to believe such testimony, and jurors are generally unaware that such identification has weaknesses.

**{¶113}** Appellant notes that the court followed *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986), but that case was decided before the 1994 amendment to Ohio Evidence Rule 702 which requires expert testimony to be reliable before it can be rendered admissible. Appellant contends that because no other evidence tied him to the crimes, it was constitutional error for the court to grant the State's motion in limine and refuse to allow Dr. Bull Kovera to offer an opinion as to her reasons why she thought Ms. Bosworth's identification was incorrect.

**{¶114}** Appellee responds that the trial court did not abuse its discretion. Appellee asserts that although *Buell* predated the 1994 amendment to Evid.R. 702, cases after the amendment still cite to and apply the *Buell* standard. Appellee cites Ohio post-amendment caselaw holding that an eyewitness expert is not permitted to present opinion testimony as to whether a specific eyewitness identification was wrong or unreliable. *State v. Patterson*, 8th Dist. Cuyahoga No. 101415, 2015-Ohio-873, *State v. Horton*, 10th Dist. Franklin No. 10AP-466, 2011-Ohio-1387, ¶ 23 and *State v. Carter*, 6th Dist. Ottawa No. OT-21-023, 2022-Ohio-3855.

**{¶115}** This assignment of error has no merit. We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Buell*, 22 Ohio St.3d at 133, 489 N.E.2d 795. Evid.R. 702 was amended in 1994 and it provides for the testimony

of experts. In *Buell,* the Ohio Supreme Court held that a psychologist may testify as an expert under Evid.R. 702 "concerning the variables or factors that may impair the accuracy of a *typical* eyewitness identification." *Id.* at 131. [Emphasis in original]. However, the Court further held that Evid.R. 702 did not allow a psychological expert to opine about the credibility of a specific eyewitness' identification testimony unless the eyewitness had a physical or mental impairment that may affect that witness' ability to observe or recall events. *Id.*

**{¶116}** As Appellee notes, although *Buell* preceded the 1994 amendment to Evid.R. 702, cases after 1994 continue to cite to and apply the standards set forth in *Buell*. *See Patterson*, 2015-Ohio-873, ¶ 63.

**{¶117}** Before the jury trial began, the court heard arguments and ruled on preliminary motions, including the State's motion in limine to exclude Dr. Bull Kovera from testifying as to Ms. Bosworth's eyewitness identification of Appellant under *Buell*. Dr. Bull Kovera's expert report opined that substantial evidence existed to find that factors were present in the instant case that adversely affected Ms. Bosworth's ability to correctly identify Appellant, such as the stress of the event, the fact that Ms. Bosworth saw Appellant a few nights before the incident, and alleged suggestiveness of the photo array. Dr. Bull Kovera also opined that any in-court identification of Appellant by Ms. Bosworth was contaminated by her viewing Appellant in the photo arrays.

**{¶118}** The trial court referred the parties to page three of Dr. Bull Kovera's report where she opined as to conditions known to impair the ability of eyewitnesses in general, such as stress of the event, use of a weapon and multiple perpetrators. (Tr. at 20). Defense counsel responded that he intended to put on evidence that is admissible under *Buell*. (Tr. at 22-23).

**{¶119}** The court held that *Buell* stood for the holding that eyewitness identification testimony in general is beyond a jury's common experience and Evid.R. 702 therefore allows such testimony. (Tr. at 23). The court stated that it sustained the State's motion in limine only as to Dr. Bull Kovera testifying as to eyewitness identification of Appellant, but she could testify as to variables or factors that may impair a typical witness' accuracy in identifying a perpetrator. (Tr. at 23).

{¶120} Thus, the trial court did not abuse its discretion in applying *Buell* to limit the expert testimony of Dr. Bull Kovera on the issue of Ms. Bosworth's eyewitness identification of Appellant as the shooter. The trial court permitted Dr. Bull Kovera to testify as to her studies of factors generally impacting an eyewitness' ability to properly identify a perpetrator, including factors like the witness confronted with a weapon, dealing with multiple perpetrators, seeing a perpetrator before an incident or in a photo array, and the cumulative effect of such factors on an identification. (Tr. at 967-984, 998-999). The court did not permit the expert to specifically apply these factors to Ms. Bosworth's identification because there was no evidence that Ms. Bosworth suffered a physical or mental impairment affecting her ability to observe or recall events.

{¶121} Accordingly, Appellant's second assignment of error lacks merit and is overruled.

{¶122} In his fifth assignment of error, Appellant asserts:

**THE APPELLANT'S CONVICTIONS MUST BE VACATED AS HE WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

{¶123} Appellant contends that his trial counsel was ineffective because he commented on more than the evidence and he failed to mention in closing that Trevice could not have been shot the way that Ms. Bosworth stated he had. He also asserts counsel's ineffectiveness in refusing to allow him to testify at trial. He explains that he complained at sentencing that he wanted to testify at his trial, but his counsel told him that he could not. He also contends that he had witnesses to testify on his behalf, but he acknowledges that this is a matter for post-conviction as insufficient evidence exists in the record to support this assertion.

{¶124} Appellee asserts that the trial transcript shows no indication that Appellant wished to testify or that counsel refused him that opportunity. Appellee further notes that decisions on strategy and trial tactics are left to counsel, which includes advice given by counsel on a client's decision to testify. Appellee cites *State v. McCaleb*, 11 Dist. Lake No. 2002-L-157, 2004-Ohio-5940, ¶ 94, where the court held that the defendant could not base his claim of ineffectiveness of counsel on counsel's refusal to allow him to testify where the record showed no evidence that counsel barred him from testifying or that he

wanted to testify. Appellee notes that the court held that evidence outside of the record would be required to demonstrate such a claim.

**{¶125}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If the performance was not deficient, then there is no need to review for prejudice. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). The contrary is also true.

**{¶126}** To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), citing *Strickland, supra*, at 687-689. Our review is highly deferential to counsel's decisions because of the strong presumption that counsel's conduct fell within the wide range of what would be considered reasonable professional assistance. *Id.* There are "countless ways to provide effective assistance in any given case." *Id.*

**{¶127}** To show resulting prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra*, at 694.

**{¶128}** In *State v. McCaleb*, 11th Dist. Lake No. 2002-L-157, 2004-Ohio-5940, the appellate court held that a defendant could not sustain a claim that his trial counsel was ineffective for prohibiting him from testifying at trial. For the first time at his sentencing hearing, the defendant complained that he wanted to speak at trial but his counsel advised him not to, but he did not care and he wanted to speak. *Id.* at ¶ 93. The court noted the basic principle that it is the criminal defendant and not counsel who makes the ultimate decision on whether the defendant should testify. *Id.*, at ¶ 94, citing *State v. James,* 10th Dist. No. 98AP-327, 1998 WL 832185, at *4 (Nov. 24, 1998). The court further noted that if a defendant agrees with counsel's decision that he not testify, the defendant cannot later complain that his right to testify was violated. *Id.*, citing *State v. Ashley*, 4th Dist. No. 99 CA 2514, 2000 WL 772699, *5.

**{¶129}** In *McCaleb*, the court held that the defendant could not sustain his ineffectiveness of counsel claim based on counsel's failure to allow him to testify because

Case No. 22 MA 0102

there was no evidence in the record to show that counsel barred him from doing so. *McCaleb, supra*, at ¶ 95. The court found that there was no evidence that the defendant raised this issue at trial and evidence outside the record would be necessary to support this claim. *Id.*

**{¶130}** In the instant case, Appellant stated the following at his sentencing:

I was found guilty. I don't believe - - it's not because I did something wrong, because something I did. I was found guilty because the lack of defense and evidence by my lawyer to defend me properly. I had things to say. I had four witnesses, not including myself, who had things to say. Nobody got any opportunity to say anything. All they heard was their side of the story. And it's easy to hear one side of the story and go based on that.

I ain't prepared for this so I'm a little nervous. Excuse me. I feel they found me guilty because all they heard was the prosecutor's side of the story and no defense. He did nothing that I asked to be done. So poor representing. And then in light of - - I also feel like I'm in this predicament because I chose to protect my family by not speaking up and saying certain things that I could have said, but I would put my family at risk and put my family in danger if I say what was going on, what was really happening. So I'm in a lose-lose situation. I have to go to trial and risk my life that way or tell on these guys and risk my family's life. I was in a fucked up situation. Excuse my language. But I was in a bad situation. So I don't - - I mean, you got a job to do. I'm gonna get life regardless, not matter it's a hundred years, ten years, but – I don't know. I put it in your hands.

One thing I can say though is this has impacted my life, and in a bittersweet way. Even though I was failed by the system, you - - you showed me that everybody ain't bad. I remember you saying mentor or a judge that step down right before you stepped up, and he told you how you should treat everybody that comes to the court. When you said that you showed me by your actions that you're not a bad person. You're not the enemy. I grew up learning that police is the enemy because - - the judge, prosecution,

anybody, I can't talk to them. That's why I lied to the detective and to anyone. That's how I was raised. You know, you don't - I don't want to talk at all and if you talk you don't tell the truth about nothing. That's how I was raised. But during the time you have shown me - - even Jennifer - - even though she had a job to do, I'm not mad. I don't blame nobody. I don't blame Jennifer. I blame this guy a little bit (indicating). No, I like him. I like this guy more than anything. But, yeah, I appreciate.

(Sent. Tr. at 32).

{¶131} Appellant's counsel then stated that:

[i] meant to say, on how this case was indicted, on how this case was indicted is the reason I couldn't put my client on, or I advised him not to, on the way this case was indicted. So my client says he's innocent to this day.

(Sent. Tr. at 32).

{¶132} It appears that Appellant did want to testify, but agreed with counsel not to do so. While Appellant asserts that he wanted to testify, he states that he needed to protect his family so he did not. Accordingly, the record does not support Appellant's assertion that counsel prohibited him from testifying at trial. Further, while he also asserts that he had four witnesses to testify on his behalf, he does not indicate the substance of their testimony. There is also no evidence of record concerning decisions on other witnesses testifying for the defense at trial.

{¶133} In addition, even if deficient performance existed, Appellant fails to show resulting prejudice. He fails to demonstrate that the outcome of his trial would have been different had he testified or his witnesses testified at trial.

{¶134} Accordingly, Appellant's fifth assignment of error is without merit and is overruled.

{¶135} In his sixth assignment of error, Appellant asserts:

**THE TRIAL COURT ERRED BY FAILING TO RECORD ALL SIDEBARS AS REQUIRED BY OHIO CRIM. R. 22, THUS DEPRIVING APPELLANT**

Case No. 22 MA 0102

**THE LIBERTY SECURED BY U.S. CONST., AMEND. XIV AND OHIO CONST., ART. I, §§1, 2, AND 16**.

**{¶136}** Appellant contends that while his counsel failed to object to a lack of recording all sidebars at trial, the trial court should have ensured that all sidebars at trial were recorded. He cites 49 transcript pages where sidebars were conducted but not recorded. He acknowledges that his counsel should have objected, but states that the trial court has a duty to make sure that proceedings are orderly and conducted in accordance with law and rules of criminal procedure. He cites in particular Crim.R. 22, as well as the federal and state constitutions' rights to due process in support.

**{¶137}** This assignment of error lacks merit. Crim.R. 22 requires that all proceedings be recorded in serious offenses. However, the Ohio Supreme Court has held that "reversal will not occur because of unrecorded pretrials or sidebars where the defendant has failed to demonstrate that a request was made at trial or objections were made, that an effort under App.R. 9 was made to reconstruct what occurred, and that material prejudice resulted." *State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685 (1997), syllabus.

**{¶138}** The Court applied its determination in *Palmer* in the capital case of *State v. Goodwin*, 84 Ohio St.3d 331, 340, 1999-Ohio-356, 703 N.E.2d 1251 (1999). Goodwin asserted that his trial transcript was inadequate for appellate review because 8 pretrials and 27 bench conferences were not recorded. *Id.* at 340. The Court held that "[i]t is clearly the duty of counsel to request and ensure that all sidebar conferences are recorded by the court stenographer." *Id.*, citing *State v. Grant*, 67 Ohio St.3d 465, 481, 620 N.E.2d 50 (1993). The Court held that Goodwin waived any possible error because no pretrial motion was made to record all sidebars and his counsel did not request that the pretrials and sidebars be recorded. *Id.* The Supreme Court indicated that it would not presume prejudice from the "'mere existence of * * * unrecorded bench and chambers conferences* * *.'" *Id.*, quoting *Palmer, supra*, at syllabus.

**{¶139}** We applied the Ohio Supreme Court's holdings in a different case entitled *State v. Palmer,* 7th Dist. Mahoning No. 19 MA 108, 2021-Ohio-4639 and rejected Palmer's assignment of error that the trial court erred in violation of Crim.R. 22 by failing to record all sidebars. Appellant's assignment of error in this case suffers the same fate

as he makes the same assertion and his counsel failed to request that sidebars be recorded, he did not attempt to reconstruct the sidebars pursuant to App. R. 9(C), and he failed to explain how the lack of recordings of the sidebars resulted in prejudice to him.

**{¶140}** Accordingly, Appellant's sixth assignment of error lacks merit and is overruled.

**{¶141}** In his fourth assignment of error, Appellant asserts:

**THE APPELLANT'S CONVICTIONS MUST BE VACATED AS THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THEREFORE VIOLATE U.S. CONST. AMEND. XIV, AND OHIO CONST., ART. I., §16.**

**{¶142}** Appellant contends that his convictions were against the manifest weight of the evidence because all of Ms. Bosworth's testimony, except that pertaining to her being shot in her Mercedes, was incredible. Appellant notes that Ms. Bosworth testified that she was a certified nursing assistant, but she owned a Mercedes and a Jaguar. Appellant further notes that Trevice rents an apartment in Boardman and is donating money to a family even though he has no job. Appellant also implies that drug dealers put all of their assets in the names of their girlfriends to avoid detection. He further argues that the physical evidence established that the shooter was in the car and not leaning into the car to shoot, as Ms. Bosworth testified. He further asserts that his expert impeached Ms. Bosworth's testimony as unreliable eyewitness identification testimony. He further contends that it was not proven that he was at the house on Ferndale, that he was the shooter, or that he was in the Mercedes.

**{¶143}** Appellant further argues that almost all of the evidence was contradictory to Ms. Bosworth's testimony. He cites to the facts that the only DNA found in the car was that of Allen May, the house where Ms. Bosworth testified she and Trevice were kidnapped was not the correct house, and the shooting did not occur at the area where Ms. Bosworth stated it did because no glass, blood, casings, or tire marks were found at the scene and no neighbors heard gunshots. He asserts that the only evidence tying him to the shootings was Ms. Bosworth's self-serving testimony.

{¶144} Appellee counters that the jury was within its province to find that the evidence supported Ms. Bosworth's testimony. Appellee asserts that the jury did not lose its way because Ms. Bosworth's testimony alone sufficed to convict Appellant. Appellee notes that Ms. Bosworth knew Appellant before the shooting as she had met him on prior occasions, and she identified Appellant as the shooter during the 911 call and identified him from a photo array the day after the shooting. (Tr. at 403-405, 433-435). Appellee notes that Ms. Bosworth identified the house where the kidnapping occurred and it happened to be associated with Appellant. (Tr. at 811-813).

{¶145} Appellee further asserts that the jury could have also found credibility issues with Appellant's police interview answers about the night in question and his relationship with Trevice. Appellee notes that Appellant told Detective Sergeant Zubal that he did not know Trevice at all, but later admitted that he knew him. (Tr. at 841). He also stated that he did not know that Trevice was dead, but he never called Trevice after the shooting even though they had consistent contact before that time. (Tr. at 848). Appellee also notes that Appellant claimed that a phone number attributed to him by Detective Sergeant Zubal was not his, but then admitted that it was. (Tr. at 845-846).

{¶146} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶147} Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *Id.*, citing *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins, supra,* at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence

except by the concurrence of all three judges hearing the cause." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 36 quoting Ohio Constitution, Article IV, Section 3(B)(3).

**{¶148}** The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. Jefferson No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, this Court will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶149}** Since we find that cumulative error applies and a new trial is warranted, we decline to rule on this assignment of error.

## CONCLUSION

**{¶150}** In sum, the circumstances of this case contain cumulative errors that deprived Appellant of a fair trial. The trial court erred by denying defense counsel time to properly absorb and educate themselves as to the unique issue presented in Assignment of Error Number 1 before conducting individual juror voir dire as to possible juror misconduct. The court also erred by limiting Appellant to the remedy of a trial continuance in light of a 2-year delay in disclosing favorable DNA identification information and prosecutorial wrongdoing that was similar to that conducted in Appellant's other criminal case as indicated in Assignment of Error Number 3. While these errors alone do not constitute reversible error, the cumulative effect of them constituted a deprivation of a fair trial to Appellant. We therefore reverse the trial court's judgment and remand this case for a new trial.

Waite, J., dissents with dissenting opinion.

Robb, P.J., concurs.

Case No. 22 MA 0102

Waite, J., dissenting.

**{¶151}** I respectfully dissent from the conclusion that Appellant is entitled to a reversal of his convictions and a new trial based on the cumulative effect of errors he alleged in assignments of error one and three. I begin by noting that in Ohio, despite "the myriad [of] safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *State v. Howard-Ross*, 7th Dist. No. 13 MA 168, 2015-Ohio-4810, 44 N.E.3d 304, ¶ 11, citing *State v. Rupp*, 7th Dist. No. 05MA166, 2007-Ohio-1561, ¶ 83; *State v. Jones*, 90 Ohio St.3d 403, 422, 739 N.E.2d 300 (2000). While a criminal defendant is appropriately afforded a plethora of rights and protections, he is not guaranteed a trial free of harmless imperfections. That said, I see no error in this record, harmless or otherwise.

**{¶152}** Beginning with Appellant's first assignment of error, there cannot be a violation of Appellant's right to a fair trial where there was no evidence that an outside influence affected the integrity of the deliberations and verdict. While any allegation that a juror has been followed after hours by any person during a trial is troubling, in the instant matter, there is no definitive evidence that such behavior even occurred. Although the possibility cannot be conclusively ruled out, this record contains ample evidence that, regardless, it did not affect either the jury's deliberations or verdict.

**{¶153}** Juror P.H. informed the court and respective counsel during questioning that she may have been followed while driving home at some point during the proceedings. However, she admitted that she considers herself a "paranoid person" and has in the past erroneously believed someone was following her. She also explained that the vehicle she thought was following her ceased its efforts sometime before she reached her final destination.

**{¶154}** To be clear, the majority finds reversible error, but not for any failure of the jurors to advise the court or court staff of the alleged incident, or for proceeding with deliberations and rendering a verdict. Nor does it find the verdict was the result of any kind of bias. Instead, the majority finds error with the trial court's decision to deny defense counsel's request for additional time to research the issue prior to questioning the jurors.

Case No. 22 MA 0102

**{¶155}** While caselaw regarding this exact situation is not abundant, the First District has recently addressed a similar situation in *State v. Finnell*, 1st Dist. Hamilton No. C-220440, 2023-Ohio-2563, ¶ 30, appeal not allowed, 171 Ohio St.3d 1511, 2023-Ohio-3952, 220 N.E.3d 842. In relevant part, a juror in that case informed the bailiff that she and another juror believed the defendant, who had posted bail during trial, had been following them. After questioning, it became apparent that multiple jurors not only viewed the defendant as a dangerous person whom they feared, but of more concern, the jurors had developed perceptions about the defendant which affected their verdict. *Id.* at ¶ 42.

**{¶156}** The *Finnell* court relied on law from the United States Supreme Court opining that "we should focus on what the jurors describe about their deliberative process, not the conclusions they reach about their own fairness." *Id.* at ¶ 40, citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed. 2d 78 (1982). The court found reversible error based entirely on the jurors' admitted injection of their negative personal feelings towards the defendant in reaching a verdict.

**{¶157}** Unlike the jurors in *Finnell*, the jurors in the instant case were not convinced P.H. had actually been followed. Again, P.H. not only informed the court of her paranoid tendencies, but also admitted these to her fellow jurors. Also unlike *Finnell*, the alleged conduct did not become the forefront of their deliberations. Only one discussion was had about the subject amongst the jurors, and all agreed that while P.H. mentioned the incident, none of them thought there had been a valid threat. Not a single juror in the instant case expressed a concern that Appellant was dangerous or that he presented any threat to their safety. Importantly, it is not Appellant who was alleged to have followed P.H. in the instant matter, it was a woman who she believed was in the courtroom at some point during the proceedings. We also note the instant issue involved only one alleged incident, which may have been innocent, whereas *Finnell* involved at least four incidents involving several different jurors.

**{¶158}** When the matter was raised to the judge, the court announced it would question the jurors. The court denied defense counsel's request for additional time to research the issue prior to questioning, determining that time was of essence. However, the court informed counsel that it would permit the parties to brief the issue after the jurors were questioned, thus allowing the relevant information to remain fresh in the minds of

the jurors while still somewhat accommodating counsel's request for research. Nothing about this decision is unreasonable. Just the opposite, the trial court appears to have handled this situation in an entirely efficient and judicious manner, intended to obtain present-sense information from the jurors and also allow time for a thorough analysis of the alleged incident's impact on the trial, if any.

**{¶159}** While defense counsel's request for time to research the issue was intended to gain counsel time to develop his own questions for the jurors, as earlier stated, this is a rare scenario and there is scant precedent on the subject. There is a plethora of law that holds a trial court judge possesses broad discretion in running his or her courtroom. While Appellant's counsel wished to conduct research to assist in developing questions for the jurors, there is no law granting counsel the right to have such opportunity. Counsel's unsupported request for additional time to formulate questions for the jurors in this situation is far outweighed by the concern of the trial court in preserving the jurors' present-sense memories and the sanctity of the trial.

**{¶160}** While the possibility a juror may have been followed could be unnerving to some degree, it is readily apparent from the jurors that this allegation was not taken seriously and did not play any role in their deliberations or verdict. The jurors all testified none of them felt the need to discuss it amongst themselves, particularly as P.H. herself admitted she was unsure if she had, in fact, been followed. She had informed the rest of the jurors of her paranoid tendencies. Hence, while the majority finds harmless error in the trial court's decision to deny counsel's request, I cannot find error at all in the trial court's actions, here.

**{¶161}** The majority then combines their determination as to this issue with an allegation by Appellant that a *Brady* violation occurred. The majority decides the two assignments, harmless individually, rise to reversible error when considered together. Within Appellant's third assignment of error, the majority again takes issue, not with a substantive error, but with the trial court's procedure.

**{¶162}** I must emphasize here that a *Brady* violation does not actually occur unless a defendant proceeds to trial without the benefit of, and knowledge of, potentially exculpatory evidence. While it is troubling that evidence of additional DNA evidence detected by CODIS was not given to Appellant for nearly three years after its discovery,

and there had been some prior discovery issues in another case involving Appellant, Appellant was fully informed of this DNA evidence prior to trial. The majority agrees that no actual *Brady* violation occurred in this case. Instead, it takes issue with the trial court's decision to remedy the late submission of the DNA evidence with a continuance. However, I see no other possible remedy based on the facts of this case. The majority states that something "more than a continuance of this case is warranted," but does not provide or even suggest what remedy it believes the trial court should have granted. Disclosure was delayed, but was made before trial. The late disclosure of the evidence certainly did not require a dismissal of the charges. The record in this matter reveals the trial court's decision to grant Appellant additional time to review the evidence before trial was entirely reasonable and warranted. There was no error in the trial court's action in this matter, harmless or otherwise. Based on my review of this record, as this record reveals no errors occurred, reversal based on "cumulative error" is not appropriate and unsupported. Thus, I disagree with the majority opinion and would affirm this case in its entirety.

[Cite as *State v. Knight*, 2024-Ohio-2176.]

---

For the reasons stated in the Opinion rendered herein, Appellant's seventh assignment of error is sustained and correspondingly, the cumulative error in assignments of error one and three are sustained. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is reversed. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**